# EXHIBIT 1

**AFFIDAVIT OF SPECIAL AGENT DAVID DINDINGER IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, David Dindinger being duly sworn, depose and state:

**INTRODUCTION and AGENT BACKGROUND**

1.      I am a special agent ("SA") with the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), currently assigned to the HSI Springfield, Massachusetts ("MA"), Resident Agency. I was assigned to the HSI Albuquerque, New Mexico, Office of the Assistant Special Agent in Charge from November 2010 until March 2018.

2.      As an HSI agent, I am responsible for assisting with and conducting investigations relating to national security and public safety, in particular those matters with a nexus to HSI investigative purview involving suspected violations of federal law. I have received training and gained experience in conducting investigations related to financial fraud including, mail fraud, wire fraud, identity theft and money laundering.

3.      I make this affidavit in support of applications to search the following, pursuant to Rule 41 of the Federal Rules of Criminal Procedure:

  a.  The premises located at ▮ Justice Street, North Providence, Rhode Island 02911 (the **"Subject Premises"**), further described in Attachment A-1;

  b.  A vehicle described as a 2012 Toyota Sienna, VIN number, ▮▮▮▮6038 (**the "Subject Vehicle"**) further detailed in Attachment A-2; and

  c.  The person described as BUKKY OLUKOGA ("SUBJECT PERSON") further described in Attachment A-3.

There is probable cause to believe that within the **SUBJECT PREMISES** and **SUBJECT VEHICLE** and on the **SUBJECT PERSON** are evidence, fruits, and instrumentalities of the offenses detailed below and further described in Attachment B.

4.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

1

5. As described in detail below, I am currently investigating Bukky OLUKOGA ("**OLUKOGA**"), and others, who I suspect are engaging in bank fraud, conspiracy to commit bank fraud, money laundering, conspiracy to commit money laundering, unlicensed money transmitting, attempting to evade taxes, making a false statement in a tax return, and currency structuring, in violation of 18 U.S.C. §§ 1344(2), 1349, 1956, 1956(h), 1957, and 1960; 26 U.S.C. § 7201 and 7206; and 31 U.S.C. § 5324 , respectively (**the "Subject Offenses"**). To date, the investigation concerns the use of various corporate entities, bank accounts, and money transfer services, such as Cash App and Zelle, by OLUKOGA's and others to receive and remit funds in high volume for numerous persons; OLUKOGA's deposit of a large number of cash deposits into accounts in her name at various Massachusetts and Rhode Island bank locations; and the transfer of funds from bank accounts under OLUKOGA's control to various individuals and international entities, all in a manner that appears to be inconsistent with her stated employment and business operations.

## JURISDICTION

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

A. Persons and Companies Believed to be Associated with the **Subject Offenses**.

7. Bukky OLUKOGA, DOB of ███/1974. OLUKOGA is a naturalized U.S. citizen who was born in Nigeria, according to DHS records. Records indicate that OLUKOGA first entered the U.S. in December 1993 and became a naturalized citizen in May 1999.

8. I have identified two addresses for OLUKOGA including the **Subject Premises** and a prior address of ███ Sunset Ave, ███ North Providence, RI 02904. Public records indicate OLUKOGA sold the property located at ███ Sunset Ave in December 2021. A review of public property records indicates that on April 30, 2021, OLUKOGA purchased the **Subject Premises** at a sale price of $270,000.00. Additionally, subpoenaed bank records received form Bank of America, list OLUKOGA's address on her Bank of America account ███████4307 as ███Justice Street, North Providence, RI 02911-2010, the address of the **Subject Premises**.

2

9.     Rhode Island Division of Motor Vehicles ("RI DMV") registration checks revealed OLUKOGA is the registered operator of the **Subject Vehicle** with an effective date listed on the registration as September 1, 2021. **The Subject Premises** is listed as the residential address for the vehicle. RI DMV checks also list a driver's license for OLUKOGA, with an issue date of April 4, 2022. The **Subject Premises** is listed as the residential address on OLUKOGA'S license. On May 19, 2021, agents observed OLUKOGA enter the **Subject Vehicle** and leave her residence. Agents followed the Subject Vehicle as it made several stops throughout North Providence before returning back to her residence.

10.     I have also learned through public records reviews that OLUKOGA is licensed as a Certified Nurse Assistant ("CNA").

11.     Grace's Property Investment LLC ("Grace's Property"). Rhode Island Department of State ("RI DOS") filings revealed OLUKOGA is the registered owner of Grace's Property Investment LLC. ("Grace's Property") with the **Subject Premises** listed as the address for the business as of October 1, 2021. [1] OLUKOGA is listed as the Resident Agent of Grace's Property with no additional members reported. According to RI DOS records, the business was established in Rhode Island on February 6, 2009.

12.     Annual reports for Grace's Property filed with RI DOS in 2020 and 2021 listed the character of the business conducted as "investment in houses" and "investments houses" In bank account opening documents for Grace's Property, OLUKOGA completed forms related to the company operations, and described the business as "lessors of residential buildings and dwellings" and "residential property managers."

   a.   According to Santander Bank records, in a questionnaire completed to open the business account, OLUKOGA described the business as "Lessors of Residential Buildings and Dwellings." On the Santander questionnaire, the percentage of international sales or operations anticipated on the account was listed as 0 percent.

   b.   In business account opening documents with TD Bank, the principal line of business is listed as "residential property managers" and the estimated annual

---

[1] RI DOS records for Grace's Property list a prior address of ▮▮Sunset Ave, ▮▮▮ North Providence, RI, which, as stated above, is a prior residence for OLUKOGA.



sales are listed as $0-$500,000. In response to a question as to what types of customer/vendors will the business be working with, the response was "realtors."

13.    Internal Revenue Service ("IRS") records indicate that in January 2009 OLUKOGA applied on behalf of Grace's Property to receive an Employer Identification Number ("EIN"). The IRS thereafter assigned federal EIN ▮▮▮▮9784 to Grace's Property.

14.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("▮▮▮▮▮▮"). ▮▮▮▮▮▮ is a Nigerian national who is residing in the United States on an IR1 Visa, as a spouse of a United States citizen, according to DHS records. ▮▮▮▮▮ first entered the United States on January 12, 2013, at Boston Logan International Airport. ▮▮▮▮▮▮'s address is listed at ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. I have reviewed open-source business records, social media accounts and conducted an analysis of historical telephone toll data for ▮▮▮▮▮ and have learned he has associations with the Nigerian companies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Based on the Whats App messages described below, ▮▮▮▮▮▮ is also believed to be associated with an entity named ▮▮▮▮▮▮▮▮▮▮▮▮▮ However, to date, I have not found any open source or other information showing an association between ▮▮▮▮▮ and ▮▮▮▮▮ A LinkedIn account for ▮▮▮▮▮ listed his occupation as a ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

15.    I conducted open-source records checks for information relating to ▮▮▮▮▮ and learned the company was established in May 2018. An address for the business was listed as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A company website was located at ▮▮▮▮▮▮▮▮▮▮▮ and listed the company's line of business as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Two company phone numbers were listed on the website, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

16.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮ is a Nigerian national. DHS records indicated ▮▮▮▮▮▮ ad also traveled to the United States on (10) occasions between 2009 and 2021. ▮▮▮▮▮▮ last entered the U.S. on August 15, 2021.

a.  On August 15, 2021, ▮▮▮▮▮▮ arrived at Boston Logan International Airport via commercial airliner and was admitted on a B2 tourist visa. DHS records indicated ▮▮▮▮▮▮ had previously applied for a visa on February 20, 2020, for an anticipated arrival to Chicago in April 2020. ▮▮▮▮▮▮'s application listed his employer as "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and his duties as "Managing Director."

b.  I have reviewed open-source records concerning a company based in Nigeria known as ▮▮▮▮▮▮▮▮▮▮, that is associated with ▮▮▮▮▮. I reviewed several publications produced by Nigerian news media outlets, as well as a publication by the Nigerian Economic and Financial Crime Commission ("EFFCC"), a law enforcement agency in Nigeria charged with investigating financial crimes, that describe money laundering activities in relation to internet fraud in connection with ▮▮▮▮▮ and companies associated with him, including ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    i.  The first publication I reviewed was an article posted online on ▮▮▮▮▮▮ 2020, by the Peoples Gazette of Nigeria. The article indicated several individuals of an ▮▮▮▮▮▮▮▮▮▮ were convicted by a federal court in ▮▮▮▮ Nigeria for offenses related to ▮▮▮▮▮▮ The article stated ▮▮▮▮▮▮▮▮▮▮▮ was the suspected leader of the organization and that he established ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including ▮▮▮▮▮▮▮▮▮▮▮▮[2]

    ii.  The second article I reviewed was posted on the EFFCC website on ▮▮▮▮▮▮ 019 and indicated ▮▮▮▮▮▮ was charged in Nigeria along with ▮▮▮▮▮▮▮▮▮▮ for offenses of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

Those convicted were purported to have engaged in a romance scam that targeted an individual residing in Canada. That article stated ████████ was "at large."[3] As described below, I encountered and met with ████████ on September 8, 2021, when he was traveling back to Nigeria from the United States. A National Crime Information Center query found no responsive wants or warrants for ████████

iii. In November 2021, I obtained a copy of a legal charging document from the ████████████████████████████████████████ ████████████████████████ The document detailed violations of the Nigeria Cybercrime Act of 2015 on the part of ████████ and two other individuals. The document listed ████████ as "Now At Large"

B. Income Tax Records Analysis Shows Stated Income by OLUKOGA Less Than Amounts Received by OLUKOGA Via Third Party Money Transfer Business and Outbound International Transfers.

17.    As part of this investigation, I have worked with and received information from an IRS agent, who has advised me of the following tax related information. IRS records indicate OLUKOGA is licensed as a CNA and earns wages as reported on Forms W-2.

18.    OLUKOGA timely filed U.S. individual income tax returns, Forms 1040, with the IRS for tax years 2019 and 2020. Both years reported wage income earned from services performed as a CNA and also reported net income from a Schedule C for GRACE'S PROPERTY INVESTMENT, LLC. IRS databases lists Grace's Property as a single member Limited Liability Company ("LLC"). For income tax purposes, for an LLC with one member, the LLC's activities are reflected on its owner's federal income tax return. OLUKOGA reported Grace's Investment activities on Form 1040, Schedule C, Profit or Loss from Business, in her tax returns

---

[3] ████████████████████████████████████████████████
████████████████████████████████████████████████

19.     OLUKOGA's 2019 personal tax return showed reported wages earned of $154 and Schedule C gross receipts (for Grace's Property) in the amount of $95,300. In 2019, OLUKOGA also reported a gain on the sale of real property in the amount $27,470.

20.     OLUKOGA's 2020 personal tax return showed reported wages earned in the amount of $71,490 and Schedule C gross receipts (for Grace's Property) in the amount of $84,360.

21.     There were no other sources of income reported on OLUKOGA's personal tax return for years 2019 and 2020. Over the 2019 and 2020 tax years, only one sale of real property was reported on OLUKOGA's income tax return.

22.     The income earned from W-2 wages and the sale of property (described above) reported by OLUKOGA are supported by documentation found in IRS databases. However, research of subpoenaed documents and IRS databases found no support for the above-described Schedule C gross receipts claimed by Grace's Property / OLUKOGA during the investigative years.[4] Based on my training and experience, and that of the IRS agent who is working on this investigation, I believe that the stated Schedule C gross receipts are inconsistent with the one identified record of property sale from 2019. Further, as described herein, the income reported by OLUKOGA / Grace's Property is inconsistent with the amount of money identified through this investigation as received by her from third parties through third party money transfer applications, cash deposits and cashier's check deposits made by her; and transfers made by OLUKOGA to international entities.

C.    Records of Money Transfer Businesses Show a Large Volume of Transfers from Third Parties to OLUKOGA in 2020 and 2021 Using Cash App and Zelle.

23.     I know that OLUKOGA utilizes the money transfer business / application Cash App and Zelle based on my reviews of subpoenaed bank records that showed, among other things, money transfers completed via Cash App[5] and Zelle[6]. From my review of records, I

---

[4] IRS databases showed no records of tax documents filed under Grace's Investment EIN or OLUKOGA'S social security number as payee.

[5] Cash App is owned by which is owned by Square Inc. ("Square").

[6] Zelle is owned by Early Warning Services.

know that OLUKOGA also transferred funds from Cash App and Zelle to bank accounts in her name.

24.    From my training and experience, and work on this case, I know that money transfer services like Cash App and Zelle are private businesses that allow users to transfer money through web-based platforms and mobile phone applications. Users can request and transfer money via the application with either an email account or phone number. Cash App users can also withdraw funds from their accounts with a Visa debit card at ATMs or transfer funds to linked bank accounts. I also know that Cash App and Zelle communicate with users via email or text message to notify them of certain activities on the account, including successful money transfers or transfers that were not completed. Zelle requires users to have a valid email to register an account, while Cash App users can register with an email or mobile phone number.

25.    Based on my training and experience, I know that third party money transfer services, such as Cash App and Zelle, are sometimes used by individuals and criminal organizations to move funds derived from illicit activities such as internet-based fraud. I also know that these activities can generate significant cash proceeds and that individuals will use third party money transfer services and bank accounts to funnel those illicit proceeds. Bank accounts that are linked to third party transfer services can be used by criminal organizations, and for criminal purposes, to deposit cash proceeds, in many cases, at or just below the Currency Transaction Report ("CTR") threshold of $10,000.00. To avoid filing a CTR with the bank, individuals will conduct multiple transactions on the same day at different times, or on consecutive days, in many cases making deposits at different bank branches. Zelle permits users to transfer fund within the United States. Cash App operates in the United States and in the United Kingdom, but users cannot send money internationally.

*Cash App Records Review*

26.    In summary, my review of OLUKOGA's Cash App records (provided by Square) revealed the following:

    a.    OLUKOGA used Cash App from May 2020 to October 2020.

    b.    OLUKOGA's Cash App account was established on May 10, 2020. The name listed on the account was Bukky OLUKOGA, DOB of ████ 1974, and the account had a listed address of ████ Orms St, Providence, RI 02908, a prior

address associated with OLUKOGA. The Google Account, ████@*gmail.com*, was listed as the email for the user account. [7]

c.   Two bank accounts were linked to the OLUKOGA Cash App user account, an account with TD Bank ████4361 ("4361") and an account with Citizens Bank ████2186 ("1286").

d.   The Cash App account for OLUKOGA was listed as closed and according to the records, the user was "blacklisted" as of October 23, 2020.

e.   The Cash App (Square) records included email correspondence, including an email that was sent to OLUKOGA from *emailsupport@cash.app* on October 23, 2020. The email stated the account was closed due to transfer activity that was in violation of the Cash App terms of service.

f.   According to Cash App records, users continued to attempt to send money to OLUKOGA's Cash App account after she was "blacklisted" through March 10, 2021.

27.   I reviewed the Cash App Terms of Service to gather more information about declined transfers and Peer to Peer transfer policies. I learned that Cash App's Peer to Peer Service allows users to send or receive funds from other users for "non-commercial" purposes. Cash App does not permit users to send or receive more than $1,000.00 over a thirty-day period unless additional identification information is provided to Cash App to verify the user's identity. The terms of service also permit Cash App to reverse payments made to users if they believe the payments were made in error, such as fraud. [8]

28.   Transaction activity in OLUKOGA's Cash App account showed that between approximately May 25, 2020, and October 23, 2020, OLUKOGA was the recipient of approximately $69,966.00 in money transfers from (26) different Cash App users. Transfer details for these transactions listed the purpose for the transfers among other things as, "niger", "transfer", "payment" or "shipment." In addition, the Cash App records show that several of the

---

[7] On February 18, 2022, this Court authorized a search of the Google account ████@gmail.com. See Case No. 22-SW-044-PAS.

[8] https://cash.app/legal/us/en-us/tos#P2P

users who attempted to send OLUKOGA funds had the transfers either blocked by Cash App or they exceeded transaction limits and were not completed.

29.    One of the Cash App users who sent OLUKOGA funds was an individual user listed as A███████ S██████ ("S█████████"). Between July 6, 2020, and August 28, 2020, S█████████ sent OLUKOGA $18,750.00 in funds via (13) Cash App transfers as follows:

> *07/06/2020, $2,500.00 paid to OLUKOGA*
> *07/06/2020, $1650.00 paid to OLUKOGA*
> *07/07/2020, $1250.00 paid to OLUKOGA*
> *07/08/2020, $1000.00 paid to OLUKOGA*
> *07/10/2020, $700.00 paid to OLUKOGA*
> *07/14/2020, $2500.00 paid to OLUKOGA*
> *07/26/2020, $2000.00 paid to OLUKOGA.*
> *07/26/2020, $750.00 paid to OLUKOGA*
> *07/27/2020, $2000.00 paid to OLUKOGA*
> *07/30/2020, $1000.00 paid to OLUKOGA*
> *08/01/2020, $1000.00 paid to OLUKOGA*
> *08/03/2020, $1000.00 paid to OLUKOGA*
> *08/28/2020, $1400.00 paid to OLUKOGA*

The Cash App records also showed that in addition to the above transfers, the account holder / S█████████ attempted (52) other transfers to OLUKOGA that were declined. The stated reason in the Cash App records was that these transfer attempts exceeded the monthly and/or weekly Cash App transaction limits. In addition, as described herein, in July and August 2020, while S█████████ was sending money to OLUKOGA via Cash App, S█████████ sent funds to OLUKOGA through two other means. First, from July 4, 2020 and July 8, 2020, S█████████ sent approximately $5,000 in funds to OLUKOGA via Zelle. In addition, S█████████ withdrew at least two cashier's checks from accounts in her name at PNC Bank that were deposited into OLUKOGA's bank accounts. For example, on July 27 2020 and August 3, 2020, OLUKOGA deposited cashier's checks in the amounts of $22,000 and $16,000, respectively, that were drawn on PNC Bank accounts in the name of S█████████. Those two cashier's checks were deposited into a Bank of America Account ████████8108 held in the name of Bukky OLUKOGA.

30.    I have conducted queries of DHS databases to further identify S█████████. I have located records for S█████████, DOB ████1991, that indicated she was a Lawful Permanent Resident of the United States who was born in Nigeria. S█████████ first entered the

United States in October 2017. Open-source records listed an address for S██████████ as ██████ ███████, Philadelphia, PA 19153-1704.

31.     I also obtained additional information concerning S██████████ that was provided to me by an HSI Agent in Rapid City, South Dakota. I learned that S██████████ had been identified as the payee on (4) United States Postal Service ("USPS") money orders for $1,000.00 each, that were mailed to ████████████████ 77ᵗʰ Street, Philadelphia, PA (S██████████ S address) from an individual ("Subject 1") residing in Rapid City, SD. The USPS tracking information indicated the money orders mailed by Subject 1 were delivered to S██████████'s address in Philadelphia on September 2, 2020. Evidence was gathered that indicated the funds used to purchase the money orders by Subject 1 were derived from fraudulent New York State Department of Labor ("NYDOL"), Pandemic Emergency Unemployment Assistance and Federal Pandemic Unemployment Insurance payments.[9]

32.     Based on my training and experience, and work on this investigation, I believe that S██████████ used Cash App, as well as Zelle and other banking transactions, to send fraudulent proceeds of criminal activity to OLUKOGA.

*Zelle Records Review*

33.     Through my review of Zelle records, I have confirmed that OLUKOGA has a Zelle Account. Although I have not yet determined the date that the Zelle account was opened, from my review of bank records and Zelle records, I know that OLUKOGA had a Zelle Account and used it dating from at least December 2019. The records for the Zelle account showed that ██████████@*gmail.com* is listed as the user email for OLUKOGA's Zelle account and the account phone number is listed as ████████4304, which is also the phone number listed in account holder documents for OLUKOGA and/or Grace's Property bank accounts described below. OLUKOGA's Zelle account was linked to a Citizens Bank account of OLUKOGA's and to a Bank of America bank account.

---

[9] The payments were applied for through NYDOL using the name of another individual ("Subject 2") residing in Las Vegas, Nevada. The funds were then deposited into a bank account held by Subject 1. The unemployment payments deposited into the account of Subject 1 were made between April 12, 2020, and September 6, 2020, and consisted of weekly disbursements of $182.00 and $600.00 for a total of $14,922.00.

34.     From my review of Zelle records, it appears that OLUKOGA received approximately $239,855.00 in transfers from approximately 59 persons between April 2020 and November 2020. The transfer amounts ranged from $20.00 to $5000.00.

35.     The Zelle records also show four transfers from A██████S██████████ to OLUKOGA, for a total of $5000 from approximately July 4, 2020, to July 8, 2020, and five denied transfers:

| | | |
|---|---|---|
| 7/4/2020 | *Transfer to OLUKOGA* | *$100* |
| 7/4/2020 | *Transfer to OLUKOGA* | *$900* |
| 7/5/2020 | *Transfer to OLUKOGA* | *$800 (Denied)* |
| 7/5/2020 | *Transfer to OLUKOGA* | *$800 (Denied)* |
| 7/5/2020 | *Transfer to OLUKOGA* | *$800 (Denied)* |
| 7/5/2020 | *Transfer to OLUKOGA* | *$800 (Denied)* |
| 7/6/2020 | *Transfer to OLUKOGA* | *$800 (Denied)*[10] |
| 7/7/2020 | *Transfer to OLUKOGA* | *$1,000* |
| 7/7/2020 | *Transfer to OLUKOGA* | *$2,000* |
| 7/8/2020 | *Transfer to OLUKOGA* | *$1,000* |

As described herein, the investigation has shown that S██████████ was also transferring money to OLUKOGA using Cash App, as described above, from July 6, 2020, through August 28, 2020, and via cashier's checks.

36.     Analysis of telephone records revealed OLUKOGA had approximately (336) contacts with Zelle via text message between March 6, 2020 and September 2, 2020.[11]

*OLUKOGA and Grace's Property Are Not Licensed as a Money Services Business*

37.     On June 15, 2022, an HSI Criminal Analyst conducted queries of U.S. Treasury Department databases to determine if OLUKOGA or Grace's Property were licensed money services businesses ("MSB") [12]The query confirmed no licenses were on file for OLUKOGA or

---

[10] Zelle records also show that OLUKOGA spoke with a Zelle representative on or about July 6, 2020, and reported that she was having trouble receiving money.

[11] Some of these contacts may be automatically generated text notifications relating to transactions.

[12] A MSB is defined by the Department of the Treasury as follows:

"any person doing business, whether or not on a regular basis or as an organized business concern, in one or more of the following capacities:

(1) Currency dealer or exchanger; (2) Check casher; (3) Issuer of traveler's checks, money orders or stored value; (4) Seller or redeemer of traveler's checks, money orders or stored value; (5) Money transmitter; (6) U.S. Postal Service.

Grace's Property. Therefore, I do not believe that OLUKOGA personally, or through her business, is a licensed as a money service business.

38.    Based on my training and experience and my review of records relating to the nature of OLUKOGA's employment and her business, Grace's Property, I believe that OLUKOGA's use of Cash App and Zelle to receive funds, and the amount of funds received by her through Cash App and Zelle, is not consistent with either the stated purpose of OLUKOGA's business or what would be expected for the banking activities of a U.S. based real estate professional or CNA.

D.    Bank Records for OLUKOGA and Grace's Property Show Use of Bank and Brokerage Accounts to Receive Funds from Third Party Money Transfer Business Cash App and Zelle, Cash Deposits, and International Wire Transfers to.

39.    I have subpoenaed and reviewed bank records for accounts held by OLUKOGA and Grace's Property Investment, at Santander Bank, TD Bank, Citizens Bank, Bank of America and Washington Trust.

*Santander Records Review*

40.    My review of the records provided by Santander Bank revealed the following:

    a. OLUKOGA was the sole account holder on the four accounts at Santander: ███████7325 ("7325") opened on June 16, 2020; ███████647 ("4647") opened on September 9, 2020; ██████8868 ("8868") opened on December 16, 2004; and ██████2192 ("2192") with an unknown date of opening.

---

An activity threshold of greater than $1,000 per person per day in one or more transactions applies to the definitions of: currency dealer or exchanger; check casher; issuer of traveler's checks, money orders or stored value; and seller or redeemer of travelers' checks, money orders or stored value. The threshold applies separately to each activity -- if the threshold is not met for the specific activity, the person engaged in that activity is not an MSB on the basis of that activity.
No activity threshold applies to the definition of money transmitter. Thus, a person who engages as a business in the transfer of funds is an MSB as a money transmitter, regardless of the amount of money transmission activity.

Notwithstanding the previous discussion, the term "money services business" does not include:
A bank, as that term is defined in 31 CFR 1010.100(d) (formerly 31 CFR 103.11(c)), or
A person registered with, and regulated or examined by, the Securities and Exchange Commission or the Commodity Futures Trading Commission." https://www.fincen.gov/money-services-business-definition

b.  The address listed on the account opening documents for accounts (7325) and (4647) was ▮ Sunset Ave, ▮ North Providence, RI 02904, a prior address associated with OLUKOGA.

41.  I reviewed transaction activity on the Santander accounts and learned that between March 2, 2020, and April 28, 2021, approximately $455,535.00 in cash deposits were made into the above-listed accounts at Santander branches located in RI and MA. Of those cash deposits, only one deposit was made for an amount over $10,000.00. The deposits occurred at branch locations including in Providence, RI, Cranston, RI, Smithfield, RI, Pawtucket, RI, Rumford, RI Johnston, RI Lincoln, RI and Fall River, MA. For example, the bank records showed the following cash deposits in Santander account (8868), most in amounts below $10,000. For example, Santander records show he following cash deposits were made on the noted dates and locations.

| Date | Account | Deposit Cash | Transaction Detail |
|---|---|---|---|
| 3/3/2020 | 8868 | $1,200.00 | Cash |
| 6/15/2020 | 8868 | $9,990.00 | Elmhurst |
| 6/19/2020 | 8868 | $9,990.00 | Cranston |
| 6/24/2020 | 8868 | $9,995.00 | Pawtucket |
| 6/26/2020 | 8868 | $9,995.00 | Johnston |
| 7/6/2020 | 8868 | $9,995.00 | University Heights |
| 7/13/2020 | 8868 | $9,995.00 | Johnston |
| 7/17/2020 | 8868 | $9,995.00 | University Heights |
| 7/21/2020 | 8868 | $9,995.00 | Elmhurst |
| 8/3/2020 | 8868 | $9,995.00 | University Heights |
| 8/7/2020 | 8868 | $9,950.00 | Lincoln |
| 8/12/2020 | 8868 | $9,950.00 | Edgewood |
| 8/17/2020 | 8868 | $9,980.00 | Cranston |
| 8/19/2020 | 8868 | $9,980.00 | Pawtucket |
| 8/21/2020 | 8868 | $9,980.00 | Lincoln |
| 8/24/2020 | 8868 | $9,980.00 | Johnston |
| 8/27/2020 | 8868 | $40,000.00 | Johnston |
| 9/1/2020 | 8868 | $8,000.00 | East Side |
| 9/3/2020 | 8868 | $10,000.00 | Elmhurst |
| 9/9/2020 | 8868 | $9,900.00 | Elmhurst |
| 9/11/2020 | 8868 | $8,000.00 | Cranston |
| 9/14/2020 | 8868 | $4,900.00 | University Heights |
| 9/25/2020 | 8868 | $9,600.00 | University Heights |
| 10/2/2020 | 8868 | $8,600.00 | Cranston |

| | | | |
|---|---|---|---|
| 11/5/2020 | 8868 | $5,500.00 | Elmhurst |
| 11/9/2020 | 8868 | $1,100.00 | Smithfield |
| 11/13/2020 | 8868 | $8,900.00 | Smithfield |
| 11/23/2020 | 8868 | $7,800.00 | Smithfield |
| 11/30/2020 | 8868 | $6,000.00 | Elmhurst |
| 12/8/2020 | 8868 | $9,800.00 | Cash |
| 12/11/2020 | 8868 | $3,550.00 | Cash |
| 1/19/2021 | 8868 | $9,000.00 | Smithfield |
| 1/22/2021 | 8868 | $6,500.00 | Newport Ave |
| 1/29/2021 | 8868 | $3,700.00 | Cranston |
| 2/12/2021 | 8868 | $5,500.00 | Elmhurst |
| 2/23/2021 | 8868 | $2,900.00 | Smithfield |
| 3/2/2021 | 8868 | $9,700.00 | Elmhurst |
| 3/8/2021 | 8868 | $8,900.00 | Johnston |
| 3/9/2021 | 8868 | $5,000.00 | Newport Ave |
| 3/17/2021 | 8868 | $6,500.00 | fall river, MA |
| 3/18/2021 | 8868 | $3,300.00 | Elmhurst |
| 3/25/2021 | 8868 | $1,500.00 | Elmhurst |
| 4/6/2021 | 8868 | $2,800.00 | Smithfield |
| 4/9/2021 | 8868 | $600.00 | Elmhurst |
| 4/16/2021 | 8868 | $2,200.00 | Elmhurst |
| 4/28/2021 | 8868 | $2,400.00 | Elmhurst |

Based on my training and experience, cash deposits of those transaction amount, as well as making cash deposits at multiple branch locations, are inconsistent with OLUKOGA's stated business. Further, such activity is commonly an indicator of money laundering and structuring to avoid currency reporting rules.

42.    The Santander records also showed international wire transfers sent from Santander accounts (8868) and (4647), including the following wires.

     c.    On September 21, 2020, an international wire transfer of $205,050.00 was sent to ▮▮▮▮▮ a business associated with ▮▮▮▮▮ described above, from Santander account (8868).

     d.    On January 8, 2021, an international wire transfer of $100,050.00 was sent to ▮▮▮▮▮ 1307 in Lagos, Nigeria ("▮▮▮▮▮") from Santander account (4647). As described herein, although not confirmed, ▮▮▮▮▮ is a business believed to be associated with ▮▮▮▮▮.

e.  On January 13, 2021, an international wire transfer of $70,000.00 was sent to ▮▮▮▮ from Santander account (4647).

f.  On February 25, 2021, an international wire transfer of $100,050.00 was sent to ▮▮▮▮ from account (4647).

g.  On March 31, 2021, an international wire transfer of $20,000.00 was sent to  Ningbo, China from account (8868).

43.  I conducted open-source records checks for information relating to ▮▮▮ and ▮▮▮. I was unable to locate any information for ▮▮▮. Open-source records located for ▮▮▮ revealed the company was established in 1999 and specialized in garment accessories and tailoring materials, providing fabrics to worldwide customers. A company website was found at https://www.▮▮▮. Two addresses were located for ▮▮▮ ▮▮▮ Ningbo, 315000, China and ▮▮▮ ▮▮▮ Ningbo, 315000, China.

44.  My review of the Santander records concerning account (8868) also revealed that OLUKOGA received funds from an account held at Key Bank under the name ▮▮▮ ▮▮▮, an entity that was reported to the Federal Bureau of Investigation, Internet Crime Complaint Center ("IC3"), for fraud activity. A review of the Santander wire transfer record revealed a transfer of $8,850.00 that was sent to account (8868) on 9/17/2020 from the ▮ ▮▮▮ Key Bank account, ▮▮▮ 6321 ("6321"). The purpose of the transfer listed on the wire transfer record was "Director Fees for Video Shoot."

45.  I conducted a query of the IC3 database and located a report filed on 1/20/2021 by a company known at AEG Present LLC. ("AEG"). The report alleged that a business email compromise fraud scheme had resulted in a loss of $19,250.00 to AEG. The complaint detailed that on 9/7/2020, an employee in the marketing department received an email from *credit.control@sandaguk.com* requesting payment for an invoice associated with a show cancellation in Denver. The AEG employee received two additional emails from the same account requesting payment of $19,250.00 with instructions to send the funds to the ▮▮▮ ▮▮▮ account (6321). On 9/17/2020 the funds were wired by the AEG employee to the ▮▮▮ account.

16

*TD Bank Records*

46.     My review of the records provided by TD Bank revealed that OLUKOGA had three accounts at TD Bank

      a.  OLUKOGA was the sole account holder on personal checking account ▮▮▮▮ 4361) ("4361") that was opened on August 17, 2020. The address listed on the account at opening was ▮ Sunset Ave, ▮ North Providence, RI 02904. Beginning in November 2021, the **Subject Premises** was listed as the address on the account statements. The cell phone listed on the account was ▮▮▮ 4304. I noted that TD Bank account 4361 is the account that was connected to the Cash App account described above.

      b.  OLUKOGA is the named account signer on a business account (▮▮▮ 8408) ("8408") in the name of Grace's Property Investment LLC that was opened on June 25, 2021. The business address listed was ▮ Sunset Ave, North Providence, RI 02904 and OLUKOGA is listed as the sole owner. In the account opening documents, OLUKOGA listed the **Subject Premises** as her address. The business phone number is listed as ▮▮▮ 4304.

      c.  OLUKOGA was a joint account holder with A▮▮ OLUKOGA on a simple savings account (▮ 9410) ("9401") that was opened on June 21, 2021. The address listed for both account holders was the **Subject Premises.**

47.     I reviewed transaction activity on the TD accounts and learned that between August 17, 2020, and August 24, 2021, approximately $151,540.00 in cash deposits were made into the accounts 4361 and 9410 at TD Bank branch locations in RI and MA. Of those cash deposits, only one deposit was made for an amount over $10,000.00. The deposits occurred at branch locations in North Providence, RI, Barrington, RI, Johnston, RI and New Bedford, MA. As stated above, based on my training and experience, cash deposits of that amount, as well as making cash deposits at multiple branch locations, are inconsistent with OLUKOGA's stated business. Further, such activity is commonly an indicator of money laundering and structing to avoid currency reporting rules.

48.     The TD Bank records also show receipt of funds from Square (Cash App) into TD Bank account 4361.

49.     The records for TD Bank account 4361 also revealed (2) international wire transfers were made from the 4361account to entities in Nigeria and China.

a.   On October 13, 2020, an international wire transfer of $300,050.00 was sent to an account held by ▮▮▮▮▮▮ in Lagos, Nigeria.

b.   On December 16, 2020, an international wire transfer of $20,000.00 was sent to an account held by ▮▮▮ in China.

*Citizens Bank Records*

50.     My review of the records provided by Citizens Bank revealed the following:

a.   OLUKOGA was an account holder on the following four accounts at Citizens Bank: ▮▮▮5268 ("5268") opened on September 14, 2019; ▮▮▮9513 ("9513") opened on July 1, 2020; ▮▮▮5744 ("5744") opened on April 19, 2019; and ▮▮1286 ("1286") with an unknown date of opening.

b.   Accounts (5268), (9513) and (5744) were listed in the name of Grace's Property Investments LLC. Account (1286) was listed in the name of Bukky OLUKOGA.

c.   The address listed for accounts (1286) (9513) and (5744) was ▮▮Sunset Ave, ▮▮ North Providence, RI 02904. The address listed for account (5268) was ▮▮ Orms Street, Providence, RI 02908-4968.

51.     I reviewed transaction activity on the Citizens accounts and learned that between February 16, 2020, and September 1, 2020, approximately $1,772,935.00 in cash deposits were made into the above listed accounts at bank locations in RI and MA. Of those cash deposits, only one deposit was made for an amount over $10,000.00. The deposits occurred at branch locations in Providence, RI, North Providence, RI, Warrick, RI, North Smithfield, Johnston, RI, Greenville, RI, Cranston, RI, Cumberland, RI, Lincoln, RI, Pawtucket, RI, Norwood, MA, Raynham, MA, Braintree, MA, Lynn, MA, Brockton, MA, Peabody, MA and Mansfield, MA. As stated above, based on my training and experience, cash deposits of that amount, as well as making cash deposits at multiple branch locations, are inconsistent with OLUKOGA's stated business. Further, such activity is commonly an indicator of money laundering and structing to avoid currency reporting rules.

52.     The Citizens Bank records also show deposit of funds from Square (Cash App) into Citizens Bank account 1286. Between July 7, 2020 and 9/1/2020, the account received approximately $29,920.00 in funds transfers via Square.

53.     Eight (8) wire transfers totaling $1,650,400.00 were sent to ▮▮▮ from Citizens accounts (5268) and (5744) between July 14, 2020, and August 31, 2020. The wire transfers to ▮▮▮ were as follows:

| From Account (5268) | From Account (5744) |
|---|---|
| 8/6/2020, $200,050.00 | 7/14/2020, $100,050.00 |
| 8/12/2020, $200,050.00 | 7/27/2020, $200,050.00 |
| 8/17/2020, $200,050.00 | |
| 8/19/2020, $100,050.00 | |
| 8/24/2020, $300,050.00 | |
| 8/31/2020, $350,050.00 | |

54.     The bank records also show that shortly before Citizens account 5268 was closed, on September 9, 2020, $277,000 was withdrawn from that account. On September 9, 2020, $277,000 was deposited into OLUKOGA's # 8688 Santander Account.

<u>Robinhood Records</u>

55.     As part of this investigation, I have also reviewed account records pertaining to OLUKOGA's Robinhood account (Account # ▮▮▮7660). Robinhood is a financial services company headquartered in Menlo Park, CA that facilities the commission-free trades of stocks, exchange-traded funds, and cryptocurrencies. In her account opening documents, OLUKOGA provided a yearly income of "$25,000 to $39,999", a net worth of up to $24,999 and a source of funds of "Savings or personal income".

56.     Further review of the Robinhood records, indicated that OLUKOGA linked checking account number ▮▮▮8868 ("8868") to the Robinhood account. Robinhood did not provide the bank name for checking account 8868, but based on my review of other bank records pertaining to the investigation, I believe that this is OLUKOGA's Santander Checking Account ▮▮▮8868. Additionally, Robinhood records revealed OLUKOGA linked TD Convenience Checking account number ▮▮▮4361 ("4361"), Bank of America Adv Plus Banking Account number ▮▮▮4307 ("4307"), and Total Checking Account number ▮▮▮0267 ("0267").

57.    I have reviewed ACH transfers conducted from accounts linked to OLUKOGA's Robinhood account, which revealed the following transactions:

**To/From TD Bank Account 4361**

| | |
|---|---|
| 3/30/2022 $50,000.00 (W/d from RH) | **From Santander Account (8868 _into RH_)** |
| 3/25/2022 $4,000.00 (Deposit to RH) | 5/23/2021 $6,000.00 (Deposit) |
| 3/24/2022 $50,000.00 (Deposit to RH) | 5/19/2021 $25,000.00 (Deposit) |
| 3/17/2022 $50,000.00 (Deposit to RH) | 5/12/2021 $1,000.00 (Deposit) |
| 2/06/2022 $1,000.00 (Deposit to RH) | 5/09/2021 $8,000.00 (Deposit) |
| 9/21/2021 $35,000.00 (Deposit to RH) | 5/09/2021 $2,500.00 (Deposit) |
| 6/21/2021 $24,000.00 (Deposit to RH) | 5/09/2021 $2,5000.00 (Deposit) |
| 6/20/2021 $1,000.00 (Deposit to RH) | 5/07/2021 $1,500.00 (Deposit) |
| 5/05/2021 $1,000.00 (Deposit to RH) | 5/07/2021 $2,5000.00 (Depos |
| it) | |

58.    Based on my training and experience and review of OLUKOGA's bank records, her listed yearly income along with her listed net worth, are not consistent with the deposit and withdrawal activity conducted within the Robinhood account. I believe that these funds could be proceeds of a fraudulent endeavor and/or an effort to launder/conceal these proceeds.

*Bank of America Records*

59.    I have also reviewed records that show that OLUKOGA has accounts at Bank of America. OLUKOGA has two accounts at Bank of America in her name, Account 8108 (8108) and 4307 (4307).

60.    Between August 6, 2020, and August 12, 2020, OLUKOGA deposited 27 Western Union money orders and 2 Money Gram money orders totaling $15,300.00 into BOA account 4307. Based on my review of the money order deposit images, that were included with the subpoenaed records, I have learned that the money orders were obtained in Atlanta. I have not yet identified the senders of the money orders. Based on my training and experience, OLUKOGA's receipt of this number of money orders, particularly money orders that originated out of state, is not consistent with her stated businesses and income.

61.    From my review of the Bank of America records, I know that on July 27, 2020 and August 3, 2020, cashier's checks drawn on                   's PNC bank account were deposited into OLUKOGA's Bank of America account #8108, on July 27, 2020 and August 3, 2020 in amounts of $22,000 and $16,000, respectively. Following these deposits, a number of transfers were made from BOA #8108 to BOA #4307 in amounts of $11,000, $16,700, and $16,000, and $25,000. On August 19, 2020, a check from BOA #4307 was deposited into

Citizens #5744. Thereafter, $245,000 was moved from Citizens #5744 to #5268, after which #305,024 was wired from Citizens #5724 to ████████████, an entity associated with ████████ in Nigeria.

62.     Based on my training and experience, I believe that OLUKOGA's deposit of out of state money orders is also inconsistent with the stated business of Grace's Property and her documented employment as a CNA and believe that these funds could be proceeds of a fraudulent endeavor and/or an effort to launder money through OLUKOGA accounts. I further believe that her use of these accounts to transfer monies between her accounts, and thereafter to send international wire transfers is consistent with money laundering.

E.     Border Search of █ 's Cell Phone Show Shows Messages Relating to Deposits into Grace's Property Bank Account.

63.     On September 8, 2021, I conducted a border search of ████████ at the Boston Logan International Airport. Also present during the search and assisting were HSI SA Marshall McGuerty and HSI SA Daniel Yon. The search was conducted in the vicinity of Gate 6 in Terminal E prior to ████████ boarding an outbound commercial flight destined for Nigeria. Prior to the search and before any questioning, ████████ was given a DHS Statement of Rights Form, which he reviewed and signed, agreeing to answer questions.

64.     ████████ stated he traveled to the United States on August 15, 2021, to take his



████████ stated he rented a car on August 25, 2021, and drove to ████████████ ████████ ████████ stated he stayed in Massachusetts, in and around Boston for the duration of his visit. ████████ stated he was not familiar with Boston, as he usually traveled to Chicago when he visited the U.S. ████████ stated his brother-in-law resided in Chicago.

65.     ████████ tated he was traveling with a cellular phone, described as a Samsung Galaxy Note 9. ████████ thereafter provided his consent for HSI Agents to conduct an examination of the phone. Prior to the examination, I presented ████████ with a Consent to Search form, that he reviewed and signed, agreeing to a search of his phone.

66.     █ ████ S cellular phone was examined by SA Yon in the vicinity of Terminal E. SA Yon conducted a forensic examination of the cellular phone that included an extraction of

data from the installed WhatsApp application. Upon completion of the forensic examination, the cellular phone was returned to ▮▮▮▮▮.

67.    I reviewed data extracted from ▮▮▮▮▮'s cellular phone concerning text messages in WhatsApp. During the reviews, I located messages that ▮▮▮▮▮ exchanged with an individual that I believe to be ▮▮▮▮▮, in which they referenced, among other things, funds transfers to Nigeria and accounts associated with ▮▮▮▮▮ and ▮▮▮▮▮, companies to which OLUKOGA (personally or through her company Grace's Property has made transfers, as described above). I also located a conversation in which they discussed Grace's Property, and a person that I believe is OLUKOGA. Those messages referenced funds transfers from the United States to Nigeria and bank account numbers associated with Grace's Property. An excerpt of the messages is copied below:



*Date: 8/22/2020*

▮▮▮▮▮ : *Can u help take 100k in the US and help move to Naija*[13]
▮▮▮▮▮ *Can't it come direct to Naija?*
▮ *He said no*
▮▮▮▮▮ *Do you know the person?*
▮ *Yes*
▮ *Very well*
▮▮▮▮▮ *Naija person?*
▮ *Yes*
▮▮▮▮▮ *Let me ask my partner*
▮ *Ok*
▮▮▮▮▮ *She's is asking for $5/$1,000.00.  Cos of tax issues.*
▮▮▮▮▮ *Sorry $5/$100.00*
▮ *So how much does it come to on 100k*
▮▮▮▮▮ *$5k*
▮ *Kilode*
▮ *The money is not a gift*
▮▮▮▮▮ *Tax ni o*
▮ *Cant work*
▮▮▮▮▮ *What can work?*

---

[13] Based on my training and experience, I believe that the reference to "Naija" in the text message refers to "Nigeria" and ▮▮▮▮▮ is asking ▮▮▮▮▮ to help him move $100,000 from the US to Nigeria.



*100dollars*

*Don't get it*

*1k dollars*

*It might not work but let me speak with her revert*

*Ok*

*$3/$100.00 she just said*

*Would be very tough*

*Let me propose $2/$100 and revert.*

*Pls do $1.5/$100*

*Insisting on $2.5/$100.*

*Let us leave her*

*Will convince her to do $2/$100.00. What am I getting too?*

*Beg her for $1.5 so all in can be $2*

*Let all be $2.50/$100. I know her and the fact that it's gonna incur tax.*

*(Forwarded Text )* **011500120**

*(Forwarded Text )* **Grace's property investment LLC my account number**

*is* **5268**

**Sunset Av,** **North Providence, RI, 02904**

68.     From my work on this investigation, I know that 011500120, the number sent to                in the above message exchange is a routing number for Citizens Bank, and          5268 is the account number for the Grace's Property account opened by OLUKOGA at Citizens Bank.

69.     From my review of the bank records for Citizens Bank account 5268, I know that on August 25, 2020, three days after the above messages were exchanged between                and              , $100,000 was received, via wire transfer, into Grace's Property Citizen's bank account 5268 from sender,                          CPA,                          Silver Springs, MD 20904-2865. The bank records also show that on August 31, 2020, OLUKOGA sent a wire transfer of $350,050.00 from Citizen's account (5268) to

70.     Based on my review of transaction for Citizens Bank account (5268), my training and experience, and my work on this investigation, I believe that the conversation detailed above from Whats App relates to                asking              to help him move $100,000 from the United States to Nigeria, and thereafter,                and                discussing how much a female would be paid for moving money to "Naija" or Nigeria. Because the account information referenced by                in this text exchange was for the Grace's Property account opened by

23



OLUKOGA, and because I have reviewed telephone records showing contact between ▮▮▮▮▮ and OLUKOGA, I believe that OLUKOGA is the female referred to in the messages between ▮▮▮▮▮ and ▮▮▮▮▮ I also believe that the message exchange was a discussion about how OLUKOGA wanted to be and would be paid for receiving and sending funds through her bank accounts, as well as how much ▮▮▮▮▮ would be paid for facilitating the transaction. I believe that the message exchange shows that OLUKOGA, through ▮▮▮▮▮ was asking for $3 per every $100 that she moved.

F. <u>Border Search of OLUKOGA'S Cellular Phone.</u>

64.    On April 26, 2022, I conducted a border search of OLUKOGA at the Newark Liberty International Airport. Assisting with the search were U.S. Customs and Border Protection Officers ("CBPO") Rolando Ramirez and Theodore Hiotis, HSI SA McGuerty, and HSI Certified Forensic Agent ("CFA") Joshua Como Williams. At the time of the search OLUKOGA was traveling with a Samsung Galaxy Note cellular phone that CPBO Ramirez took possession of and provided to CFA Como Williams for examination. OLUKOGA was thereafter provided with an "Inspection of Electronic Devices Tear Sheet".

65.    OLUKOGA'S cellular phone was examined by HSI CFA Como Williams and an extraction of data from the device was completed. Upon completion of the examination, the cellular phone was returned to OLUKOGA.

66.    I reviewed data extracted from OLUKOGA'S cellular phone and located text messages that referenced, among other things, currency exchange activities and specific rates set by OLUKOGA, funds transfers to Nigerian bank accounts and a reference to the **Subject Premises.** Excerpts from the text messages were as follows:

Date 4/26/2021  - Incoming messages from ▮▮▮8370 "Blessing Mama"
*Blessing Mama: J▮▮▮ A▮▮▮ Access bank a/c nb ▮▮▮7123*
*Blessing Mama: Good morning Bukky, please send 20k to this account J▮▮▮A▮▮▮, thank you*
*Blessing Mama: Then tell me how much*



Date 4/30/2021 – Incoming Messages from ▮▮▮4332 "O▮▮▮ Aunty Abby"
*O▮▮▮Aunty Abby: MRS A▮▮▮ B M▮▮▮ ▮▮▮0134 GTB*
*O▮▮▮Aunty Abby: Send 20k to this account*

24



Date 5/25/2021 – Outgoing message to ████ 7030 "Emmanuel Brother"
*Olukoga – █ justice st north providence ri 02911*

Date 5/29/2021 – Outgoing messages to ████ 7030 "Emmanuel Brother"
*Olukoga- Please can you me send the money again please thanks*
*Olukoga - Good morning please i need the money please help me resend again please thanks*

Dates 5/30/2021 -5/31/2021 – Messages between OLUKOGA and ████ 7030 "Emmanuel Brother"
*Emmanuel Brother - Good morning Ma███ will move the naira to you today my account was blocked because i keep on trying to make the transfer*
*Olukoga - Good morning I haven't received any money yet and please help me take care of it please i an begging you please thanks*
*Emmanuel Brother - You don't need to beg me my account is not responding that's why and i told K██ to transfer the money directly to you but also talking about the network but he will go to the bank and move the naira*

Date 7/27/2021-7/28/2021 – Messages between OLUKOGA and ████ 9293 "████"
Mama"
*███ Mama – Hello, was ur rate for 800. Is or me ooo*
*Olukoga – 465 thanks*

Date 7/30/2021 -Incoming message from ████ 3101 "1 Mama a███"
*1 Mama a██ – Bukky, how much are you changing one dollar to a naira now*

Date 8/3/2021- Incoming message from ████ 8626 "L███ Mama"
*L██ Mama – How much are you doing the dollar to Nigeria? T██ L██ L███*

Date 8/25/2021 – Incoming message from ████ 1654 "N/A"
*N/A – Good evening ma. Hope your day has been good. Please I'm still expecting to hear from you anytime you have dollars to exchange for naira. I'm ready to buy @ your giving rate. Thanks ma. MR O██*

67.    In addition to the above listed text messages I also located saved images on the phone that detailed Nigerian bank account transfers of Naira (Nigerian currency) from an account held by OLUKOGA at First Bank to various individuals with accounts at First Bank,

Guaranty Trust Bank, United Bank of Africa, Zenith Bank PLC, Access Bank and Fidelity Bank PLC. I reviewed (55) saved images that detailed funds transfers sent by OLUKOGA between 1/13/2021 and 4/17/2022 that totaled approximately 79,521,370.00 Naira. When adjusted for dollars at the exchange rate of .0024 Naira to 1 U.S dollar, this amounts to approximately $191,483,94. Based on my experience I believe the above listed text messages and saved images discovered on the phone are evidence of money transmitting and currency exchanging activities on the part of OLUKOGA and it is unlikely that these banking activities are commensurate with those of a U.S. based real estate professional or CNA.

G.    Training and Experience with Financial Fraud Investigations.

68.    Based on my training and experience, I know that individuals and criminal organizations engaged in illicit money transferring, fraud and money laundering activities utilize a variety of methods to conceal and disguise the true nature and source of the funds. I know these methods are designed in part to deter law enforcement and regulators from tracing the origin of the funds and thereby discovering the underlining criminal activity. I also know from my training and experience that Nigerian based criminal organizations engaged in internet-based fraud schemes, utilize networks of individuals in the United States, including those working in otherwise legitimate business ventures, to funnel fraud proceeds to accounts in Nigeria.  By using individuals with established banking relationships and accounts, funds can be moved through accounts quickly, in many cases avoiding bank scrutiny of the activity.  Funds that are co-mingled into established accounts with higher levels of transactional activity also make detection of illicit activity more difficult for law enforcement and regulators. In some cases, it may be months or even years before the activity is detected and action taken to mitigate potential fraud loss.

69.    I know from my training and experience that individuals involved in fraud and money laundering activities attempt to conceal their involvement in the underlining criminal activity in a variety of ways. In doing so, they may engage in banking practices that, although designed to hide the true nature and source of the funds and the individual's involvement, provide significant indicators of ongoing criminal activity. The indicators may include; the opening of multiple accounts over short periods of time followed by rapid deposit and withdrawal activity, structuring of cash deposits and withdrawals to avoid IRS reporting

requirements, layering of funds after deposit via multiple transactions and or transfers between accounts, unexplained high dollar domestic and international wire transfers with little to no information provided to the banks, misinformation provided to banks when opening accounts, significant mismanagement of account funds such as excessive over drafting, the use of third party money transfer platforms and sporadic transactional activity that is not commensurate with stated business or personal activity. As detailed above, my reviews of the OLUKOGA accounts and cellular phone data identified several of these types of activities that I believe are highly indicative of fraud and money laundering. I also know from my training and experience that is unlikely OLUKOGA'S banking activities are commensurate with those of a U.S. based real estate professional or CNA.

70.    Based on my training and experience, I know that individuals engaged in wire fraud and money laundering activities, often maintain records for extended periods of time, particularly when they are involved in ongoing criminal conduct. Records are commonly maintained digitally, via the use of computer, cellular phone, or smart device, such as tablet computer, and those records can be stored on said devices indefinitely. For documents delivered electronically, offenders may also be under the mistaken belief that they deleted, hidden or further destroyed any computer-related evidence that could be retrieved by a trained forensic computer expert. In addition, wire fraud and money laundering suspects commonly retain records, which can be stored in a variety of ways such hand kept notes, logs or other forms or memorialization. For example, bank statements or documents from financial institutions are commonly delivered to account holders residential addresses. In my training and experience it is common for these records to be maintained or discarded in areas were the offender initially had access to them, including their residential address, in vehicles or other places of operation. Based on my review of records showing that deposits have been made into OLUKOGA's bank accounts in numerous locations, I believe that there may be records from banking transactions involved in the **Subject Offenses** in the **Subject Vehicle**.

71.    I know that individuals engaged in wire fraud and money laundering activities commonly deposit and withdraw bulk currency, as well as transport bulk currency, and that it is common for criminal offenders to keep proceeds of their illicit activities, in the form of bulk currency, at residential addresses, in vehicles, or in other places that offer security and ready

27

access to the property. It is common for bulk currency to be further concealed by criminal offenders in a variety of ways including the use of false or non-factory compartments in vehicles and homes, as well as in safes that are more commonly found in homes.

72.    I also know that wire fraud and money laundering suspects frequently take or cause to be taken photographs of themselves, their associates, their property, and illicit proceeds. These wire fraud suspects usually maintain these photographs in their residences, electronic devices used by them, or in properties owned or rented by them.

### H.    SEIZURE OF COMPUTER EQUIPMENT AND DATA

73.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e mail, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online. I am also aware that the Consumer Electronics Association estimated that in 2010, 86 percent of all U.S. households owned at least one computer.

74.    From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

75.    From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

76.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

77.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user generated files, computer storage media in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

78.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy

and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

  a. The volume of evidence on storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

  b. Technical requirements: analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at location(s) to be searched or seize the computer equipment for subsequent processing elsewhere.

79. The searches of the **Subject Premises, Subject Vehicle, and Subject Person** may identify computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be

disguised, mislabeled, or used without the owners knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership during execution of the search warrant(s) at the **Subject Premises, Subject Vehicle, and Subject Person**. If the items described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

## CONCLUSION

80.     Based on the forgoing, I have probable cause to believe OLUKOGA has engaged in violations of the Subject Offenses.

81.     Based on the information described above, I also have probable cause to believe that evidence, fruits and instrumentalities of these crimes, as described in Attachment B, are contained within or located on the **Subject Premises, Subject Vehicle, and Subject Person**.


Sworn to under the pains and penalties of perjury,


_____
David Dindinger
Special Agent, HSI


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by     **Sworn telephonically and signed electronically**

_____
*(specify reliable electronic means)*

August 11, 2022                        _____
Date                                            *Judge's signature*

**Providence, Rhode Island**            **Patricia A. Sullivan, USMJ**

*City and State*                          *Magistrate Judge Patricia A. Sullivan*


31